**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SUZANA RENEE DORTON, | ) | CASE NO. 1:11-cv-2790 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Suzana Renee Dorton ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"),

denying her application for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to the consent of the parties

entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On November 9, 2008, Plaintiff filed her application for a POD and DIB and

alleged a disability onset date of November 30, 2007.  (Transcript ("Tr.") 15.)  The

application was denied initially and upon reconsideration, so Plaintiff requested a

hearing before an administrative law judge ("ALJ").  (Tr. 15.)  On March 18, 2011, an

ALJ held Plaintiff's hearing by video conference.  (Tr. 15.)  Plaintiff participated in the

hearing, was represented by counsel, and testified.  (Tr. 15.)  A vocational expert ("VE")

also participated and testified.  (Tr. 15.)  On April 22, 2011, the ALJ found Plaintiff not

disabled.  (Tr. 24.)  On October 28, 2011, the Appeals Council declined to review the

ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr.

1.)

On December 27, 2011, Plaintiff filed her complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  On June 25, 2012, Plaintiff filed her Brief

on the Merits.  (Doc. No. 16.)  On August 1, 2012, the Commissioner filed his Brief on

the Merits.  (Doc. No. 17.)  On August 13, 2012, Plaintiff filed a Reply Brief.  (Doc. No.

18.)

Plaintiff asserts the following four assignments of error: (1)  the ALJ failed to

follow the treating physician rule by declining to give controlling weight to the opinions of

treating psychiatrist Yolanda Ganchorre, M.D. (Pl. Br. at 11-15.); (2) (2) the ALJ

improperly evaluated Plaintiff's credibility (PL. Br. at 16-19.); (3) the ALJ's conclusion

that Plaintiff was not *per se* disabled was not supported by substantial evidence

(Plaintiff's Brief ("Pl. Br.") at 9-11.); and (4) the ALJ relied on flawed testimony from the

VE (Pl. Br. at 19-20.).

2

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was 41 years old on her alleged disability onset date.  (Tr. 23.)  She had at least a high school education and was able to communicate in English.  (Tr. 23.)  She had past relevant work as an IT Director.  (Tr. 23.)

### B.   Medical Evidence[1]

#### 1.   Treating Providers

On September 5, 2008, Plaintiff was examined by Dr. Ganchorre upon referral from her primary physician.  (Tr. 415.)  Plaintiff complained of increasing panic attacks, an inability to sleep due to nightmares, and depression.  (Tr. 415-16.)   She described numerous instances of abuse she and her siblings suffered at the hands of their parents during her childhood, as well as her difficulties in maintaining employment as a result of the effects of the trauma she experienced as a child.  (Tr. 415-16.)  Plaintiff related a past history of drug abuse, specifically Percocet.  (Tr. 415.)  Dr. Ganchorre diagnosed Plaintiff with severe depression and post-traumatic stress disorder ("PTSD"), and assigned her a Global Assessment of Functioning ("GAF") score of 40.[2]  (Tr. 416.)

---

[1]   In addition to her mental impairments, Plaintiff alleged disability on the basis of injuries to her back and ankle.  (Tr. at 17-18.)  The ALJ determined that Plaintiff was not disabled on the basis of her physical impairments.  (*Id.*)  Plaintiff does not challenge that conclusion in her Brief.

[2]   A GAF score between 31 and 40 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family and be unable to work.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

Dr. Ganchorre prescribed Pristiq and Seroquel, and recommended that Plaintiff seek treatment from Daniel Jones, Ph.D., a psychologist.  (*Id.*)

On October 2, 2008, Plaintiff began treating with Dr. Jones.  (Tr. 437.)  She reported a history of PTSD and panic attacks, as well as past treatment at the Betty Ford Center.  (*Id.*)  She indicated that she had experienced incidents of losing track of time for as long as four and a half hours per day, and that she had once "driven from Twinsburg to Stow and [found] herself end[ing] up in Columbus."  (*Id.*)

On October 6, 2008, Dr. Ganchorre noted that Plaintiff was "very excited to tell me that she is really feeling much, much better with the treatment, " was "feeling more encouraged with life" and "sleeping better," and that her depression was starting to improve. (Tr. 436.)  During an October 9, 2008 session with Dr. Jones, Plaintiff indicated that her panic attacks were decreasing in frequency to "maybe a couple of times a day," and that she was using coping strategies to reduce her anxiety.  (Tr. 435.)  In November 2008, Dr. Ganchorre noted that Plaintiff was responding well on the Seroquel, which was helping her sleep and moderating her mood swings, and that she was taking Pristique for depression.  (Tr. 434.)  Dr. Ganchorre characterized Plaintiff's response to treatment as "good."  (*Id.*)

On December 11, 2008, Plaintiff told Dr. Jones that her mood was "more leveled with the medication," and that her sleep had improved with decreasing nightmares.  (Tr. 433).  Plaintiff complained about time loss, lack of focus and difficulty prioritizing in her life.  (*Id.*)  She described instances where she "will often lose track of time, will then come to and realize that she is saying something . . . to her father [like], 'why did you do

4

this to us.'" (*Id*.)  Plaintiff mentioned past sexual abuse by a kindergarten teacher.  (*Id*.)

On December 30, 2008, Plaintiff reported to Dr. Jones that she was being compliant

with the medication, and that "her mood is doing well."  (Tr. 432.)  On January 5, 2009,

Dr. Ganchorre noted that Plaintiff was "doing very well," that her mood was "very much

under control and stable," and that "[t]he overall response is good."  (Tr. 431.)  Because

Plaintiff complained about side effects of the Pristiq, Dr. Ganchorre prescribed Lamictal

in its place.[3]  (*Id*.)

On January 15, 2009, Plaintiff told Dr. Jones that her mood varied from anxious

to depressed to irritable, and that she was not sleeping as well as before.  (Tr. 429.)

Plaintiff reported that she had not taken her Lamictal in at least a week because she

could not afford it.  (*Id*.)  She complained of anxiety and stated that, two weeks prior,

she had suffered panic attacks.  (*Id*.)  On January 26, 2009, Dr. Ganchorre opined that

Plaintiff was "continuing to improve," noting, "She is still having a little bit more of mood

swings, more on the irritability and anxiety, but otherwise she is much improved."  (Tr.

428.) Dr. Ganchorre instructed Plaintiff to continue her titration of Lamictal, and to

increase the dosage gradually over the subsequent weeks.  (*Id*.)

During a March 4, 2009 session with Dr. Jones, Plaintiff reported having panic

attacks every other day for the preceding two weeks, feeling anxious and isolating

herself.  (Tr. 427.)  She described her mood as "distant" and stated that she had crying

spells about once each day.  (*Id*.)  She told Dr. Jones that she had stopped taking the

---

[3]   The records of Drs. Ganchorre and Jones refer to this medication using both
      its brand name, Lamictral, and its generic name, lamotrigine.  *See*
      *Physicians' Desk Reference* 1522 (PDR Network, LLC, 64th ed. 2010).

Lamictal because she could not afford it, and intended to ask Dr. Ganchorre to prescribe a generic medication at her next appointment.  (*Id*.)  After a March 10, 2009 session, Dr. Ganchorre noted that Plaintiff had interrupted her treatment with Lamictal, and that Plaintiff "noticed a big difference in her depression" during the two-week period that she was not taking it.  (Tr. 426.)  Dr. Ganchorre characterized Plaintiff's response to the Lamictal as "good and promising" when she was taking a full dose of the medication, and restarted Plaintiff on Lamictal.  (*Id*.)

After a May 5, 2009 session, Dr. Ganchorre described Plaintiff's response to the medication as "good," and characterized Plaintiff's mood as "quite elevated, but not manic, and . . . less labile."  (Tr. 424.)  Plaintiff reported having less hysterical fugues. (*Id*.)  On May 13, 2009, Dr. Jones noted that Plaintiff "has been more accepting of her condition," and continued to have "situations in which she ends up not knowing where she is going and dissociative episodes."  (Tr. 425.)  Dr. Jones described Plaintiff as "very cooperative and pleasant during the session."  (*Id*.)

On July 7, 2009, Plaintiff reported to Dr. Jones that she had experienced three panic attacks in the preceding three weeks, as well as crying spells and a sense of dread.  (Tr. 423)  Dr. Jones described Plaintiff as "very cooperative, pleasant, and somewhat passive, but responsive in the interview."  (*Id*.)  After a July 28, 2009 session, Dr. Ganchorre reported that, after having shown improvement, Plaintiff was depressed again, and reported an increase in her panic attacks.  (Tr. 422.)  Dr. Ganchorre reviewed Plaintiff's medications, and added alprazolam to treat Plaintiff's panic attacks. (*Id*.)

6

In September 2009, Dr. Ganchorre noted that Plaintiff was "status quo," that she was still experiencing disassociation, but "in much less degree and much lesser frequency," and that her therapy with Dr. Jones was going "very well."  (Tr. 418.) Ganchorre observed that Plaintiff's mood had stabilized with the use of Seroquel and Lamictal, and that "all in all, [Plaintiff] is very happy and doing well." (*Id.*)

In January 2010, Dr. Ganchorre completed a Psychiatric/Psychological Impairment Questionnaire.  (Tr. 473-80.)  She diagnosed Plaintiff with severe depression and PTSD.  (Tr. 473.)  Dr. Ganchorre listed the following as positive clinical findings that demonstrated and supported her diagnosis: poor memory, appetite disturbance with weight change, sleep disturbance (noting, "without meds"), personality change (noting, "withdrawn"), mood disturbance (noting, "depression"), emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, obsessions or compulsions (noting, "counting"), intrusive recollections of a traumatic experience, persistent irrational fears and generalized persistent anxiety.  (Tr. 474.)  Dr. Ganchorre noted the following as other clinical signs or comments: "Dissociative episodes, loses track of time, PTSD symptoms include nightmares, flashbacks to childhood [illegible], other adult life issues, loss of daughter at 29 y.o." (*Id.*)

Dr. Ganchorre opined that Plaintiff was markedly limited (defined as "effectively precludes the individual from performing the activity in a meaningful manner") in the following areas: (1) under the heading "Understanding and Memory," the ability to remember locations and work-like procedures, the ability to understand and remember

7

one or two step instructions, and the ability to understand and remember detailed

instructions; (2) under the heading "Sustained Concentration and Persistence," the

ability to carry out detailed instructions, the ability to maintain attention and

concentration for extended periods, the ability to perform activities within a schedule,

maintain regular attendance and be punctual within customary tolerance, the ability to

sustain ordinary routine without supervision, the ability to work in coordination with or

proximity to others without being distracted by them, the ability to make simple work-

related decisions, and the ability to complete a normal workweek without interruptions

from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; (3) under the heading "Social

Interactions," the ability to accept instructions and respond appropriately to criticism

from supervisors, the ability to get along with co-workers or peers without distrcting

them or exhibiting behavioral extremes, and the ability to maintain socially appropriate

behavior and to adhere to basic standards of neatness and cleanliness; and (4) under

the heading "Adaptation," the ability to travel to unfamiliar places or use public

transportation, and the ability to set realistic goals or make plans independently.  (Tr.

475-78.)

### 2.    Agency Assessments

In April 2009, psychologist J. Joseph Konieczny, Ph.D., examined Plaintiff at the

request of the Bureau of Disability Determination.  (Tr. 360-66.)  His evaluation was

based on a clinical interview of Plaintiff and an administration of the Weschler Adult

Intelligence Scale-IV.  (Tr. 360)  Dr. Konieczny reported that Plaintiff "has never been

involved in the problematic use of alcohol or other drugs."  (Tr. 361.)  He diagnosed her

8

with depressive disorder, not otherwise specified.  (Tr. 364.)  However, Dr. Konieczny

opined that, given Plaintiff's reported history of panic attacks and PTSD, possible

diagnoses of panic disorder with agoraphobia and PTSD merited consideration, noting

that "further reliable background information and history" would be helpful with respect

to those potential diagnoses.  (*Id*.)  Dr. Konieczny concluded that Plaintiff showed no

indications of impairment in her ability to concentrate, to attend to tasks, and to

understand and follow directions. (Tr. 364)  He determined that she showed moderate

impairments in her ability to withstand stress and pressure, to relate to others, and to

deal with the general public.  (*Id*.)  According to Dr. Konieczny, Plaintiff showed no

deficits in her "awareness of rules of social and conformity" and demonstrated "mild

deficits" in her overall level of judgment.  (*Id*.)

In May 2009, state agency psychologist Bonnie Katz, Ph.D., reviewed Plaintiff's

medical records and Dr. Konieczny's report, and concluded, with respect to the same

categories subsequently considered by Dr. Ganchorre in her January 2010

questionnaire, that Plaintiff was markedly limited only in her ability to interact

appropriately with the general public.  (Tr. 379.)  Dr. Katz noted that Plaintiff had denied

any history of drug abuse during her examination with Dr. Konieczny.  (Tr. 381.)  Dr.

Katz diagnosed Plaintiff with panic disorder with agoraphobia.  (Tr. 387.)  In January

2010, state agency psychologist Alice Chambly, Psy. D., reviewed Plaintiff's file and

affirmed Dr. Konieczny's May 2009 assessment.  (Tr. 472.)

9

### C.    Hearing Testimony

#### 1.    Plaintiff's Hearing Testimony

Plaintiff testified at her hearing as follows:  Plaintiff lived in a house with her husband, although she and her husband did not get along or interact.  (Tr. 35.)  She had an associates degree in computer information systems, as well as numerous certifications in information technology.  (Tr. 38.)  She suffered a disassociation disorder; that is, she suffered episodes where she lost awareness of time and had no memory of periods of time.  (Tr. 47.)  These episodes occurred weekly.  (Tr. 47.)  Her doctors associated the problem with post-traumatic stress.  (Tr. 49.)  She had a driver's license but she had not driven in two years because she had, on various occasions, lost awareness of her surroundings or destination while driving.  (TR. 36.)  One on occasion, she drove from Cleveland to Toledo without realizing it, and on another she hit and severely injured another person.  (Tr. 37.)

Plaintiff lacked concentration and memory.  (Tr. 5.4) She suffered nightmares every night.  (Tr. 50.)  She could not sleep unless she took Seroquel, and she averaged only three hours of sleep at night.  (Tr. 56.)  Consequently, she was fatigued during the day.  (Tr. 56.)  Plaintiff suffered depression; she cried often, lost contact with people (including her family), avoided "calls," and suffered panic attacks.  (Tr. 51-52.)  Since she began taking new medication, she suffered panic attacks every other day; and the panic attacks lasted for approximately five hours at a time.  (Tr. 52.)  She was embarrassed by her panic attacks and she avoided situations that might trigger them and in which people might see her.  (Tr. 52-53.)

10

Plaintiff could sit for 15 to 20 minutes before she needed to stand and move. (Tr. 58.)  She could not stand still, but needed to move; she paced for a total of a couple hours a day.  (Tr. 57-58.)  In order to go grocery shopping, she had her friend take her to the store after midnight when there were no people in the store.  (Tr. 62.) She had a computer at home, but she could not use it because she could not remember what she read.  (Tr. 63.)  She did not participate in any groups or organizations, and she did not leave the house for social occasions.  (Tr. 62.)

In response to questions from the ALJ, Plaintiff testified that she had undergone treatment for Percocet addiction at the Betty Ford Center.  (Tr. 63, 65.) She could not recall when or for how long she was treated there.  (Tr. 64.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to the VE:

> Assume a hypothetical individual of the claimant's age, education and work experience, who's limited to the full range of exertionally light work.  This hypothetical individual is relegated to the performance of simple, routine, repetitive tasks where he or she would . . . experience only occasional changes in the work setting. This person would have no interaction with the general public, but occasional interaction with coworkers.

(Tr. 75.)  The VE opined that the hypothetical individual described by the ALJ would not be able to perform any of Plaintiff's past work, but could perform work as a semi-automatic sewing machine operator, an office helper, or a duplicate machine operator. (Tr. 75-76.)  The VE testified that an individual who experienced periods of "black out" once a day for an undetermined amount of time would be precluded from performing Plaintiffs' past work, and from performing any other work available in the national economy.  (Tr. 77-78.)  Finally, the VE stated that an individual who was "off task 20 to

11

25 percent of the time" on a daily basis would be unable to sustain full time employment in any of the positions he had named in response to the ALJ's hypothetical.  (Tr. 79-80.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and*

12

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since November 30, 2007, the alleged onset date.

3.  The claimant has the following severe impairments: back strain; depression; anxiety; and post-traumatic stress disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work . . . except she is limited to simple, routine and repetitive tasks, in an environment where only occasional changes take place in the work setting, and where she would have only occasional interaction with coworkers.  Finally, the claimant should avoid all interaction with the general public.

6.  The claimant is unable to perform any past relevant work.

. . . . .

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have

13

perform.

11.   The claimant has not been under a disability, as defined in the Social Security Act, at any time from November 30, 2007, through the date of this decision.

(Tr. 15-24.)

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by

14

substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

    **B.**    **Plaintiff's Assignments of Error**

Although presented separately and addressing different aspects of the ALJ's decision, Plaintiff's assignments of error all take issue, in some way, with the ALJ's consideration of Dr. Gonchorre's opinion and assessment of Plaintiff's credibility. Accordingly, it is necessary to resolve those issues before proceeding to Plaintiff's remaining assignments of error.

    **1.**    **The ALJ's Assessments of Dr. Ganchorre's Opinions**

An ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

Here, the ALJ gave no weight to the medical source statements of Dr.

Ganchorre, concluding that her assessment of Plaintiff's limitations was inconsistent with notations in the records of her sessions with Plaintiff.[4]  (Tr. 22.)  Specifically, the ALJ pointed to Dr. Ganchorre's notations in the medical records that Plaintiff's therapy was going "very well," that Plaintiff's mood was stabilized by her medications, that Plaintiff was "very happy with what was going on," and that, eventually, Dr. Ganchorre did not need to see Plaintiff for three months.  (*Id*.)  According to the ALJ, "[t]hese notes, which indicate that the claimant has a stable condition, are inconsistent with Dr. Ganchorre's opinion that the claimant is disabled."  (*Id*.)  The ALJ also afforded "some weight" to the non-examining consultants, but noted that "the overall record" justified the limitations he assigned in determining Plaintiff's RFC.  (Tr. 22-23.)

Plaintiff argues that substantial evidence does not support the ALJ's conclusion that Dr. Ganchorre's opinions were not entitled to controlling weight.  She contends that the notations identified by the ALJ as inconsistent with Dr. Ganchorre's opinion regarding Plaintiff's limitations were not related to her ability to perform work, and that Dr. Ganchorre's conclusions in the January 2010 questionnaire were supported by her observations of Plaintiffs various psychiatric abnormalities.  According to Plaintiff, because the ALJ erred in failing to give controlling weight to Dr. Ganchorre's opinions, it follows that his conclusion regarding her RFC is also not supported by substantial evidence.  The Commissioner argues that, contrary to Dr. Ganchorre's opinions in the January 2010 questionnaire, the records reflect that Plaintiff was improving over time

---

[4]    Initially, the ALJ indicated that he accorded "some weight:" to Dr. Ganchorre's opinion, but ultimately declined to give any weight to her opinion. (Tr. 22.)

and with medication, and that, because Ganchorre's opinions in the questionnaire were conclusory and unsupported by laboratory or diagnostic tests, they were unreliable.

Plaintiff's arguments on this issue are not well taken.  Although Dr. Ganchorre's statements regarding Plaintiff's improvement were relative and unrelated to Plaintiff's functional limitations, substantial evidence in the record supports the ALJ's conclusion that Dr. Ganchorre's opinion was not entitled to any weight.  For example, the ALJ repeatedly pointed to Dr. Konieczny's observations and conclusions regarding Plaintiff's capabilities, including that Plaintiff was "oriented for person, place and time" (Tr. 18); showed no impairment in her ability to concentrate and attend to tasks (*Id*.), to understand and follow directions, to control her temper (Tr. 21), or to understand "rules of social judgment and conformity" (*Id*.); showed no indications of nervousness and anxiety (*Id*.); and showed no signs of undue impulsivity (*Id.*).  Further, the ALJ relied on his observation of Plaintiff during the hearing, noting that she "demonstrated the ability to cooperate and show respect" and "[p]resented in a very coherent manner and was responsive to all questions posed during the hearing."  (Tr. 18.)  *See Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly.")  Finally, the ALJ pointed to Dr. Ganchorre's notations that Plaintiff was stabilizing and improving with treatment, and that, at one point, she did not need to see Plaintiff for three months. (Tr. 22.)  Accordingly, as the ALJ noted, "the overall record" supports the conclusion that Dr. Ganchorre's opinion was not entitled to any weight.

17

Plaintiff argues that, even if Dr. Ganchorre's opinion is not entitled to controlling weight,  the ALJ erred by summarily rejecting her opinion without properly considering the appropriate weight to accord it.  However, the opinion reflects that the ALJ considered Dr. Ganchorre's observations of Plaintiff's progress, the consistency of her opinion with the record as a whole, and the supportability of the opinion.  *See* 20 C.F.R. § 404.1527(c)(2)-(5) (requiring an ALJ to consider certain factors when determining the weight to accord to a medical opinion).  Furthermore, and most crucially, as discussed above, the ALJ provided "good reasons" for declining to afford controlling weight to Dr. Ganchorre's opinion, such that the basis for his conclusion was apparent from the decision.  *See Wilson,* 378 F.3d at 544 (Noting that the "requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases" and to allow for meaningful review of the ALJ's decision) (internal quotation marks omitted).

## 2.    The ALJ's Assessment of Plaintiff's Credibility

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's

18

allegations have been considered' or that 'the allegations are (or are not) credible.'"

S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain

specific reasons for the finding on credibility, supported by evidence in the case record,

and must be sufficiently specific to make clear to the individual and to any subsequent

reviewers the weight the adjudicator gave to the individual's statements and the reason

for that weight."  *Id.*

      Here, the ALJ determined that Plaintiff was not credible because she was not

forthcoming regarding her history of prescription drug abuse.  (Tr. 22.)  Specifically, the

ALJ noted that Plaintiff did not report her past prescription drug abuse to Dr. Konieczny,

and that, during her hearing testimony, she failed to acknowledge her substance abuse

history until she was directly asked about it by the ALJ.  (*Id.*)  Plaintiff argues that the

ALJ's credibility assessment is not supported by substantial evidence in the record.

Specifically, Plaintiff argues that her failure to disclose her past substance abuse to Dr.

Konieczny was not suspicious because she did not relate prescription drug abuse to

illegal drugs, and because the substance abuse occurred prior to her disability.  She

also notes that there was no reason for her to disclose her past substance abuse during

her hearing testimony until the ALJ asked her about it and, when she was questioned

about it, she testified truthfully.  The Commissioner asserts that substantial evidence

supports the credibility finding.[5]

_____

[5]     Plaintiff also argues that the ALJ erred in finding her not credible based on
        inconsistencies between her testimony regarding her condition and
        capabilities and the ALJ's conclusion regarding Plaintiff's RFC.  The
        Commissioner responds by arguing that the ALJ appropriately based his
        credibility finding on inconsistencies between medical record evidence
        regarding the extent of Plaintiff's impairments and her testimony on that

The ALJ's reliance on Plaintiff's failure to disclose her past substance abuse to Dr. Konieczny is based on evidence in the record, as Dr. Konieczny's report indicates that Plaintiff denied ever having been involved in "the problematic use of alcohol or other drugs."  (Tr. 361.) This is, of course, inconsistent with other record evidence – including Plaintiff's testimony – that she received treatment for Percocet addiction at some unknown time.  This inconsistency is an appropriate basis for an adverse credibility finding.  *See Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility . . . is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.").  Further, although Plaintiff now attempts to explain why her statement to Dr. Konieczny is not actually inconsistent with the record, it is not for this Court to consider Plaintiff's post-hoc justification for the inconsistency.  *See Brainard*, 889 F.2d at 681 ("The scope of our review is limited to an examination of the record only.  We do not review the evidence *de novo*, make credibility determinations nor weigh the evidence.").

The transcript of Plaintiff's hearing testimony reveals that, prior to the ALJ's questioning on the issue, there was no reason for her to disclose her past abuse of

_____

issue.  However, review of the ALJ's decision reveals that the ALJ did not base his credibility finding on any inconsistency between Plaintiff's testimony and either the RFC or the medical evidence in the record.  Rather, the ALJ's discussion of Plaintiff's credibility was confined to a single paragraph, and based solely on Plaintiff's lack of candor regarding her prescription drug abuse.  In a paragraph several pages prior to the ALJ's discussion of Plaintiff's credibility, the ALJ concluded that Plaintiff's testimony was "not credible *to the extent they are inconsistent with* the above residual functional capacity assessment."  (Tr. 20.)  He did not, however, find her not credible because her testimony contradicted that RFC.  Accordingly, the ALJ did not base his credibility determination on any testimony or evidence other than Plaintiff's failure to disclose her past substance abuse.

prescription drugs.  She was not asked about any past history of drug or other substance abuse until the ALJ mentioned evidence in the record related to her treatment at the Betty Ford Clinic.  (Tr. 63-66.) When asked about the issue, she responded to the ALJ's questions in a manner consistent with the other record evidence.  (*Id*.)  Standing alone, this basis for finding Plaintiff not credible would perhaps be insufficient.  However, coupled with the basis discussed above, and given the deference accorded to the ALJ's conclusions on this issue, substantial evidence supports the ALJ's adverse credibility finding, and Plaintiff's arguments on this point are not well taken.

### 3. Whether Plaintiff Was *Per Se* Disabled

Plaintiff argues that the ALJ erred in determining, at the third step of his analysis, that she was not *per se* disabled under either Medical Listing 12.04 or 12.06 (20 C.F.R. Pt. 404, Subpt. P, App. 1).  The ALJ's opinion reflects that the ALJ did not rely on Dr. Ganchorre's opinion in determining that Plaintiff was not *per se* disabled.  This is likely because he declined to accord that opinion any weight.  Accordingly, to some extent, the Plaintiff's arguments on this point reiterate her challenge to the ALJ's decision to reject Dr. Ganchorre's opinion, and, for the reasons discussed above, are not well taken.

Further, substantial evidence supports the ALJ's conclusion that Plaintiff was not *per se* disabled under either Medical Listing 12.04 or 12.06.  These listings set forth the criteria for affective disorders and anxiety-related disorders, respectively.  Both listings at issue require a claimant to satisfy two sets of criteria, labeled A and B.  *Id.*  The

21

criteria in set A are not at issue here, as the ALJ considered only the criteria in set B. (Tr. 18-19).  The criteria in set B are identical for each of the two listings, and require that the claimant's condition result in marked restrictions in at least two of the following categories: activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace.  *Id.*

The ALJ determined that Plaintiff did not satisfy the criteria for either 12.04 or 12.06 because she showed only a mild restriction in activities of daily living, and only moderate restrictions in the remaining categories.  (Tr. 18-19.)  The ALJ relied on Dr. Konieczny's assessment of Plaintiff's capabilities (*Id.*), which concluded that Plaintiff showed no indications of impairment in her ability to concentrate, attend to tasks, and understand and follow directions, and only moderate impairments in her ability to withstand stress and pressure, to relate to others, and to deal with the general public (Tr. 364.).  The ALJ also pointed to Plaintiff's demeanor and testimony at the hearing. (Tr. 18.)  Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff did not satisfy the set B criteria in either of the relevant medical listings.

### 4.    Whether The VE Relied On A Flawed Hypothetical

Plaintiff argues that, because the ALJ's error in assigning no weight to Dr. Gancorre's opinion resulted in a flawed RFC, the ALJ's hypothetical to the VE was also flawed.  The Commissioner argues that the ALJ's hypothetical accurately reflected the RFC, which was based on substantial evidence in the record.[6]  Because, as discussed

---

[6]    In responding to Plaintiff's arguments on this point, the Commissioner relies, in part, on grounds not considered by the ALJ.  For example, the Commissioner points to Plaintiff's contention that her mental impairments have interfered with her ability to work since 1974, and notes evidence that

above, substantial evidence supports the ALJ's decision not to accord Dr. Ganchorre's

opinion any weight, Plaintiff's arguments on this point are not well taken.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*

U.S. Magistrate Judge

Date:  September 4, 2012

---

Plaintiff continued to work past her alleged disability onset date, as well as
Plaintiff's testimony that she has never been fired or laid off from a job due to
problems getting along with other people to argue that substantial evidence
supports the ALJ's conclusion with respect to Plaintiff's social functioning.  It
is well settled, however, that "'an agency's action must be upheld, if at all, on
the basis articulated by the agency itself.'"  *Berryhill v. Shalala*, 4 F.3d 993, *6
(6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs.
Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) (citation
omitted)).  Accordingly, this Court "may not accept appellate counsel's *post
hoc* rationalizations for agency action." *Id*. (internal quotation marks omitted).

23